Jayrie RIVERA–CONCEPCIÓN, et al., Plaintiffs,

v.

Commonwealth of PUERTO RICO, et al., Defendants.

Civil No. 08–2378 (BJM).

United States District Court, D. Puerto Rico.

Sept. 30, 2010.

---

**446**

Daliah Lugo–Auffant, Miguel A. Perez–Vargas, Perez Vargas & Lugo Auffant Law Offices, Hato Rey, PR, for Plaintiffs.

Jorge Viera, Vega Alta, PR, pro se.

## OPINION AND ORDER

BRUCE J. McGIVERIN, United States Magistrate Judge.

This case arises from plaintiff Jayrie Rivera–Concepción's ("Jayrie") expulsion in January 2007 from the Córdova and Fernós Congressional Internship Program ("Program") subsequent to her sudden manifestation of a previously-undiagnosed bipolar disorder. (*See* Docket No. 10–3). Before the court are the parties' memoranda in compliance with the court's order (Docket No. 47) requesting briefing on the following issues: (1) whether all defendants have sovereign immunity from plaintiffs' claims under Title II of the Americans with Disabilities Act of 1990 ("ADA"), *as amended*, 42 U.S.C. § 12101 *et seq.*, and section 504 of the Rehabilitation Act of 1973, *as amended*, 29 U.S.C. § 701 *et seq.*, and (2) whether sovereign immunity requires dismissal of plaintiffs' claims under Articles 1802 and 1803 of the Puerto Rico Civil Code, 31 L.P.R.A. §§ 5141, 5142.[1] (Docket Nos. 50, 51). For the reasons that follow, the court hereby **DISMISSES WITH PREJUDICE** plaintiffs' Article 1802 and 1803 claims against the Program, the Puerto Rico Senate ("Senate"), the Puerto Rico House of Representatives ("House"), and José Aponte–Hernández ("Aponte") and Kenneth McClintock in their official capacities (together with the Commonwealth, "the Commonwealth defendants"), **DISMISSES** any Article 1802 and 1803 claims against defendants McClintock and Aponte in their personal capacities, **DE**-

---

1. The court dismissed the Article 1802 and 1803 claims against defendant Commonwealth of Puerto Rico ("Commonwealth") in a previous order which also set out the factual background of the instant case. (Docket No. 47, p. 2–7, 29).

NIES defendants' motion to dismiss plaintiffs' Title II and Rehabilitation Act claim against the Commonwealth defendants, and **DISMISSES WITH PREJUDICE** any Title II and Rehabilitation Act claims against individual defendants José Aponte–Hernández and Kenneth McClintock in their personal capacities.

## STANDARD OF REVIEW

In order to survive a Rule 12(b)(6) motion, a complaint must allege "a plausible entitlement to relief." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *see also Pérez–Acevedo v. Rivero–Cubano*, 520 F.3d 26, 29 (2008). However, a court should "accept well-pled factual allegations in the complaint as true and make all reasonable inferences in the plaintiff's favor." *Miss. Public Employees' Retirement System v. Boston Scientific Corp.*, 523 F.3d 75, 85 (1st Cir.2008). While a complaint need not contain detailed factual allegations in order to withstand dismissal, a plaintiff's "obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955 (internal citation omitted). The court need not accept as true legal conclusions or "naked assertions devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949–50, 173 L.Ed.2d 868 (2009) (citing *Twombly*, 550 U.S. at 557, 127 S.Ct. 1955) (internal alteration omitted); *Maldonado v. Fontanes*, 568 F.3d 263, 267 (1st Cir.2009). The complaint must allege enough factual content

to nudge a claim across the line from conceivable to plausible. *Iqbal*, 129 S.Ct. at 1952 (citing *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955). The court's assessment of the pleadings is context-specific, requiring the court "to draw on its judicial experience and common sense." *Id.* at 1949. The plaintiff must show more than the "sheer possibility that a defendant has acted unlawfully." *Id.* Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged, but has not shown, that the pleader is entitled to relief. *Id.* at 1950 (quoting Fed.R.Civ.P. 8(a)(2)).

On a Rule 12(b)(6) motion to dismiss, "the facts are set forth as alleged in the complaint and inferences [are] taken in the light most favorable to ... the non-moving party." *Diaz–Romero v. Mukasey*, 514 F.3d 115, 116 (1st Cir.2008); *Estate of Bennett v. Wainwright*, 548 F.3d 155, 163, 165 (1st Cir.2008). The court may consider documents the authenticity of which are not disputed by the parties, documents central to the plaintiffs' claim, and documents sufficiently referred to in the complaint. *Curran v. Cousins*, 509 F.3d 36, 44 (1st Cir.2007) (internal citation omitted). When "a complaint's factual allegations are expressly linked to—and admittedly dependent upon—a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6)." *Beddall v. State St. Bank & Trust Co.*, 137 F.3d 12, 17 (1st Cir.1998).[2]

**2.** Plaintiffs filed several exhibits with their memorandum to the court that they had not filed with their amended complaint. (*See* Docket No. 50). The court's briefing order neither invited the submission of exhibits nor afforded the parties the opportunity to reply to each other's memoranda and thereby ob-

ject to any exhibits filed. (*See* Docket No. 47, p. 29). In the exercise of its discretion and in the interest of fairness to defendants, the court will not convert defendants' Rule 12(b)(6) motion to dismiss into a Rule 56 motion for summary judgment and thus declines to consider any exhibits that are not

## DISCUSSION

 Absent consent or valid congressional abrogation of state sovereign immunity, the Eleventh Amendment proscribes suits in which the state or one of its agencies or departments is named as the defendant. *See generally Tennessee v. Lane,* 541 U.S. 509, 124 S.Ct. 1978, 158 L.Ed.2d 820 (2004); *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.,* 527 U.S. 666, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999); *Seminole Tribe v. Florida,* 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996); *Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984); *Edelman v. Jordan,* 415 U.S. 651, 662–63, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). The Commonwealth of Puerto Rico is treated as a state for purposes of Eleventh Amendment immunity analysis. *Redondo Constr. Corp. v. P.R. Highway & Transp. Auth.,* 357 F.3d 124, 125 n. 1 (1st Cir.2004). "Eleventh Amendment immunity can be raised at any time because of its jurisdictional implications." *Acevedo López v. Police Dep't,* 247 F.3d 26, 28 (1st Cir.2001). The jurisdictional bar extends to officials and instrumentalities that function as arms of the state.[3] *Mt. Healthy Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Eleventh Amendment immunity "applies regardless of the nature of the relief sought," *Pennhurst,* 465 U.S. at 100, 104 S.Ct. 900, thereby barring the recovery of damages in official capacity suits brought against Puerto Rico officials where recovery will come from the public fisc. *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989); *Culebras Enters. Corp. v. Rivera Rios,* 813 F.2d 506, 516 (1st Cir.1987) (citing *Kentucky v. Graham,* 473 U.S. 159, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985)).

 The Commonwealth can waive its immunity in three ways: (1) by a clear declaration that it intends to submit itself to the jurisdiction of a federal court; (2) by consent to or participation in a federal program for which waiver of immunity is an express condition; or (3) by affirmative conduct in litigation. *New Hampshire v. Ramsey,* 366 F.3d 1, 15 (1st Cir.2004) (citations omitted). However, the Commonwealth's "waiver of sovereign immunity in its own courts is not a waiver of the Eleventh Amendment immunity in the federal courts." *Díaz–Fonseca v. Puerto Rico,* 451 F.3d 13, 33 (1st Cir.2006) (quoting *Pennhurst,* 465 U.S. at 99 n. 9, 104 S.Ct. 900).

Defendants claim sovereign immunity applies to plaintiffs' claims under Articles 1802 and 1803, the ADA, and the Rehabilitation Act. (Docket No. 51). Plaintiffs contend that defendants waived sovereign immunity from the state-law claims through their litigation conduct. (Docket No. 50, p. 4–7). Plaintiffs also argue that Congress validly abrogated defendants' sovereign immunity in the Rehabilitation Act and Title II of the ADA. (*Id.,* p. 7–11).

## I. Tort Claims Under Puerto Rico Law

 Article 1802 provides, "A person who by an act or omission causes damage to another through fault or negligence

---

central to plaintiffs' claims or sufficiently referred to in the amended complaint. *See* Fed. R.Civ.P. 12(d); *Garita Hotel Ltd. P'ship v. Ponce Fed. Bank, F.S.B.,* 958 F.2d 15, 18 (1st Cir.1992); *Orria–Medina v. Metro. Bus Auth.,* 565 F.Supp.2d 285, 305 n. 3 (D.P.R.2007).

3. Defendants state that the Puerto Rico Senate and House of Representatives are branches of the Commonwealth. (Docket No. 51, p. 21).

shall be obligated to repair the damage so done." 31 L.P.R.A. § 5141. Article 1803 makes the Commonwealth "liable in this sense under the same circumstances and conditions as those under which a private citizen would be liable." 31 L.P.R.A. § 5142. Neither law explicitly waives the Commonwealth's sovereign immunity; while Law 104, 32 L.P.R.A. § 3077, abrogates the Commonwealth's immunity with respect to negligence suits filed against it in its own courts, the statute does not extend the waiver to suits filed in federal court. *Díaz–Fonseca,* 451 F.3d at 33–34; *Maysonet–Robles v. Cabrero,* 323 F.3d 43, 51 n. 6 (1st Cir.2003).

Defendants argue that they may not be sued for torts committed outside Puerto Rico. (Docket No. 51, p. 20–22). To this end, defendants contend that the alleged tort at issue occurred outside Puerto Rican jurisdiction because Jayrie allegedly was dismissed from the Program while she was in the Washington, D.C./Alexandria, Virginia area. (Docket No. 51, p. 21–22). Plaintiffs do not address this argument. Plaintiffs' amended complaint alleges that defendant Francisco Rodríguez–Carambot ("Rodríguez"), who is in default, is an employee of the Puerto Rico Legislative Assembly, that he was also in that area at the time, and that it was he who expelled Jayrie from the Program. (Docket No. 10–3, p. 2, ¶ 6, p. 3, ¶¶ 6, 8, p. 4, ¶ 14). However, the amended complaint does not allege any particular conduct by any other defendants (*i.e.,* those in Puerto Rico at the time), save that once Jayrie's parents arrived in Washington, "the Defendants" told them she had been expelled for her health condition. (*Id.,* p. 4, ¶ 11). It is not clear whom, exactly, Jayrie's parents contacted, nor does the alleged conversation appear to cover any other act than Rodríguez's expulsion of Jayrie.

■ Law 104's waiver of immunity for negligence actions is limited; it does not comprehend "suits for damages against the Commonwealth for any act or omission of an official, police officer or employee ... [w]hich occurred outside the territorial jurisdiction of the Commonwealth." 32 L.P.R.A. § 3081(e). Rodríguez's act is the only tortious conduct alleged, and that act occurred outside Puerto Rico. The court therefore agrees with defendants that pursuant to section 3081(e) of Law 104, the Commonwealth defendants' immunity has not been waived on the facts at bar. *See Díaz–Fonseca,* 451 F.3d at 33–34 (discussing limits on Commonwealth's consent to suit for damages in tort claims).

■ Nevertheless, plaintiffs argue that defendants waived their sovereign immunity from the tort claims through litigation conduct. (Docket No. 50, p. 4–7). For litigation conduct to effect a waiver of immunity, that conduct must be "unambiguous" and "must evince a clear choice to submit [the state's] rights for adjudication by the federal courts." *Maysonet–Robles,* 323 F.3d at 52. Plaintiffs cite the Supreme Court's holding in *Lapides v. Bd. of Regents of Univ. Sys. of Ga.,* 535 U.S. 613, 622–24, 122 S.Ct. 1640, 152 L.Ed.2d 806 (2002), that a state waives its Eleventh Amendment immunity by voluntary removal of a case from state court to federal court. Because defendants removed the instant case from the Commonwealth courts to this court,[4] plaintiffs argue, they waived their immunity under *Lapides.*

Importantly, *Lapides's* "relatively narrow holding," *Maysonet–Robles,* 323 F.3d at 50 n. 5, applied to a situation in which

---

**4.** The notice of removal, which was filed by individual defendants McClintock and Aponte in their official capacities, states that "the appearing defendants expressly reserve all their rights and defenses to this action." (Docket No. 1, p. 1, n. 1).

the state had statutorily waived its immunity from state-law suit in its own courts. *Lapides*, 535 U.S. at 616, 122 S.Ct. 1640. The Court expressly declined to "address the scope of waiver by removal in a situation where the State's underlying sovereign immunity from suit has not been waived or abrogated in state court." *Id.* at 617–18, 122 S.Ct. 1640. The First Circuit has not directly addressed the issue of whether to extend *Lapides* to such circumstances. However, in an action brought in federal district court by a state seeking to enjoin federal administrative proceedings, the First Circuit declined to extend *Lapides* and found no waiver of immunity based on several "critical distinctions," though acknowledging "it is something of a close question." *R.I. Dep't of Envtl. Mgmt. v. United States*, 304 F.3d 31, 49 (1st Cir.2002) (hereinafter *RIDEM*). First, the court noted, the state was entitled to immunity in the administrative proceedings; second, the removal of the *Lapides* state-court action "was merely a continuation of the same proceeding in a different forum," unlike in the case before the court; third, the state's sole purpose in coming to federal court was to obtain an immunity determination for the claims pending in the administrative forum, whereas in *Lapides*, the state entity removed the entire dispute, comprising all of the claims at issue, to federal court. *RIDEM*, 304 F.3d at 49–50.

■ In the case at bar, the second and third considerations are the same as in *Lapides*, not distinguishable as in *RIDEM*. The first distinction, however, is strongly apposite to the facts at bar and leads me to conclude that defendants' litigation conduct has not waived their immunity from plaintiffs' state-law tort claims. As defendants have pointed out, even if they had not removed the instant action to this court, the Article 1802 and 1803 claims could not have survived in the Commonwealth court due to the limitations on Law 104's waiver of immunity. While it is not clear from the record whether defendants asserted immunity in the Commonwealth proceeding prior to removing the case, they were, as in *RIDEM*, "undoubtably entitled to immunity" in that forum. 304 F.3d at 49. Indeed, it is a noteworthy distinction that "*Lapides* only addressed waiver of the narrow immunity provided by the Eleventh Amendment, not the portability of sovereign immunity more generally." *Bergemann v. Rhode Island*, 676 F.Supp.2d 1, 6 (D.R.I.2009) (internal citation and quotation omitted). Here, by contrast, the limitations on Law 104 preserve the Commonwealth's inherent immunity as sovereign, on which the Eleventh Amendment is based. *See Alden v. Maine*, 527 U.S. 706, 712–13, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999).

Since the Commonwealth was not amenable to suit in the original forum, this court "consequently discern[s] no attempt by the state to reverse its waiver by a change in forum" or "to regain, by a change in forum, litigation advantage that the state has already renounced by a general statute." *RIDEM*, 304 F.3d at 49. As the Fourth Circuit has noted, removal of a case where the state would have been immune from suit in its own courts does not implicate "the judicial need to avoid inconsistency, anomaly, and unfairness." *Stewart v. North Carolina*, 393 F.3d 484, 490 (4th Cir.2005) (finding removal did not effect a waiver), *cited in Bergemann*, 676 F.Supp.2d at 6. This court, like the district court in *Bergemann*, "follows the lead of the First Circuit by directing its focus on the policy behind voluntary invocation—the prevention of inconsistency and unfairness," where "it is indisputable that the State could have asserted immunity against the ... claim in both state and federal court." 676 F.Supp.2d at 7–8 (de-

clining to extend *Lapides* in context of federal-law claim) (citing *RIDEM*, 304 F.3d at 49–50; further citation omitted). Accordingly, the court finds that defendants' removal of the instant action to federal court does not result in waiver of immunity.[5]

■ In its previous order dismissing the Article 1802 and 1803 claims against the Commonwealth, the court noted that the Commonwealth and the other government defendants are not one and the same for the purpose of determining immunity. (Docket No. 47, p. 27–29). It remains, then, for the court to determine which defendants share the Commonwealth's immunity. As to the Legislative Assembly, McClintock, and Aponte, the answer is straightforward. The court agrees with defendants (Docket No. 51, p. 4) that the

Senate and House enjoy Eleventh Amendment immunity as "an organic part of the central government of Puerto Rico." *See Metcalf & Eddy, Inc. v. P.R. Aqueduct & Sewer Auth.*, 991 F.2d 935, 939 (1st Cir. 1993). Regarding the individual heads of those legislative bodies, "the performance of official duties creates two potential liabilities, individual-capacity liability for the person and official-capacity liability for the [state]." *Guillemard–Ginorio v. Contreras–Gómez*, 585 F.3d 508, 531 (1st Cir.2009) (citation and quotation omitted). "[T]he Eleventh Amendment bars state law claims against state officials for injunctive or monetary relief." *Id.* (citation and quotation omitted). Consequently, McClintock and Aponte, in their official capacities,[6] share the Commonwealth's immunity from plaintiffs' Article 1802 and 1803 claims.

---

5. Because the court finds that the Commonwealth defendants have not waived their immunity either by statute or by litigation conduct, the court need not address defendants' additional argument that they are immune from suit because plaintiffs did not give them the requisite notice under Law 104. (Docket Nos. 12, p. 9; 51, p. 22–24).

6. The First Circuit explained in *Guillemard–Ginorio* that "a suit against a state officer in his or her individual capacity for money damages is not a suit against the state for purposes of Eleventh Amendment immunity." 585 F.3d at 531 (citation and quotation omitted). The amended complaint states that the Legislative Assembly of Puerto Rico "is sued through the Chairmen [sic] of the Houses it is comprised of [sic], Hon. Kenneth McClintock and Hon. José Aponte." (Docket No. 10–3, ¶ 4). Thus it appears that, as defendants contend, plaintiffs are suing McClintock and Aponte only in their official capacities. (Docket No. 51, p. 4–5). To the extent that the amended complaint can be read to seek damages against them in their personal capacities, the court will not dismiss the Article 1802 claims on sovereign immunity grounds.

However, plaintiffs' amended complaint still must allege facts sufficient to nudge their tort claims across the line from conceivable to

plausible. *Iqbal*, 129 S.Ct. at 1952 (citing *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955). Personal-capacity suits seek to impose individual liability upon a government officer "for unconstitutional or wrongful conduct fairly attributable to the officer himself" that is "taken under color of state law." *Guillemard–Ginorio*, 585 F.3d at 531 (section 1983 claim against Puerto Rico insurance commissioner) (citations and quotations omitted). "This wholesale inapplicability of the Eleventh Amendment to personal-capacity suits applies regardless of whether the claims alleged against the individual officer are grounded in state or federal law." *Id.* (citations omitted). As noted, plaintiffs allege that Rodríguez, a Legislative Assembly employee, expelled Jayrie from the Program; they never allege that McClintock or Aponte was at all involved in the expulsion. (Docket No. 10–3, ¶¶ 8, 14). Nor do they allege that Aponte or McClintock is Rodríguez's employer for Article 1803 purposes. *See Vargas v. Toledo Davila*, 2010 WL 624126, at *2 (D.P.R. Feb. 17, 2010). Therefore, plaintiffs have not alleged enough facts to make their tort claims facially plausible with regard to those two defendants, whether for direct liability (Article 1802) or *respondeat superior* liability (Article 1803). *Iqbal*, 129 S.Ct. at 1952; *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955.

■ Whether the Program also partakes of the Commonwealth's immunity requires additional inquiry. Eleventh Amendment immunity applies not only to states but also to entities that are "arms of a state." *Metcalf & Eddy*, 991 F.2d at 939. Under the First Circuit's two-part test for determining whether an entity claiming to be an "arm of the state" qualifies for sovereign immunity, the court first asks whether the state has structured the entity to share in its Eleventh Amendment immunity. *See Pastrana–Torres v. Corporación de P.R. para la Difusión Publica*, 460 F.3d 124, 126 (1st Cir.2006). The court engages in a fact-specific balancing test including, among other factors, the degree of statutory control asserted by the state over the entity; the characterization of the entity by its enabling legislation; whether the entity performs state functions, as opposed to local or non-governmental functions; and whether the state bears legal liability for the entity's debts. *Fresenius Med. Care Cardiovascular Res., Inc. v. P.R. & Caribbean Cardiovascular Ctr. Corp.*, 322 F.3d 56, 68–72 (1st Cir. 2003) (citing *Hess v. Port Auth. Trans–Hudson Corp.*, 513 U.S. 30, 44–46, 115 S.Ct. 394, 130 L.Ed.2d 245 (1994)). The Eleventh Amendment applies if these factors conclusively demonstrate that the state has structured the entity to share in its immunity. *Id.* at 68–72. However, if those factors are inconclusive, the court proceeds at the second step to consider whether damages will be paid from the state's treasury if the entity is found liable; if so, the entity is entitled to immunity. *Id.; see also Hess*, 513 U.S. at 48–50, 115 S.Ct. 394 (whether a judgment would be paid out of the state's treasury is the most significant factor in the Eleventh Amendment analysis).

■ Here, the Program was "established in the Legislature of Puerto Rico," to be "directed and administered by a Joint Committee of the Legislature" that includes the Speaker of the House, the President of the Senate, and various other members of both houses of the legislature. 2 L.P.R.A. §§ 801–802. The Joint Committee regulates the internal operations of the Program, which is funded by the Commonwealth's General Expense Budget "in a separate item under the allotment for Joint Activities of the Legislature of Puerto Rico." *Id.*, §§ 801, 805. Irrespective of whether the placement of students in internships constitutes a governmental or non-governmental function, as to which the court expresses no opinion, these indicia, particularly the dependence upon the public fisc, make it clear that the Program is an "arm of the state" intended to share in the Commonwealth's immunity.

In sum, the court **DISMISSES WITH PREJUDICE** on sovereign immunity grounds plaintiffs' Article 1802 and 1803 claims against all remaining Commonwealth defendants, namely, Program, the Senate, the House, and Aponte and McClintock in their official capacities, and **DISMISSES** any Article 1802 and 1803 claims against Aponte and McClintock in their personal capacities for failure to state a claim.

## II. Federal Claims

### A. Title II of the ADA

■ The court asked for briefing from the parties on whether the legislative branches of the Commonwealth enjoy sovereign immunity from plaintiffs' claims under Title II of the ADA. (Docket No. 47, p. 8, n. 5). Congress may abrogate a state's immunity pursuant to a valid exercise of power. *Maysonet–Robles*, 323 F.3d at 49. Congress enacted Title II to prohibit "discrimination by governmental entities in the operation of public services, programs, and activities." *Toledo v. Sanchez*, 454 F.3d

24, 30 (1st Cir.2006); 42 U.S.C. § 12132. In *Tennessee v. Lane,* 541 U.S. 509, 124 S.Ct. 1978, 158 L.Ed.2d 820 (2004), the Supreme Court held that Title II validly abrogated state Eleventh Amendment immunity as applied to "the class of cases implicating the fundamental right of access to the courts." *Id.* at 533–34, 124 S.Ct. 1978. After Lane, the First Circuit held in *Toledo* that Title II validly abrogated state immunity as applied to "the class of cases implicating the right of access to public education." 454 F.3d at 40.

Plaintiffs argue that *Toledo* controls in the instant case. They note that Jayrie's internship was eligible for credit towards Jayrie's studies at the University of Puerto Rico ("UPR"), a public university, making the Program a public education program offered jointly by UPR and the Legislative Assembly.[7] (Docket No. 50, p. 7–9). Defendants, who contend that plaintiffs fail to state a Title II claim in the first place, argue that *Toledo* is inapposite and that Title II did not validly abrogate state sovereign immunity with respect to legislative internship programs such as the instant Program. (Docket No. 51, p. 1–20).

Defendants first argue that the Program is an employment program, not an education program, and contend that plaintiffs' claims should thus be analyzed under Title I of the ADA, which prohibits employment discrimination. (Docket No. 51, p. 10, n. 10; p. 12, n. 11). As the First Circuit has noted, the circuits have split on whether the protections of Title II extend to the employment context. *Carmona–Rivera v. Puerto Rico,* 464 F.3d 14, 17 (1st Cir.2006) (citing cases and declining to decide the issue); *Currie v. Group Ins. Comm'n,* 290 F.3d 1, 6–7 (1st Cir.2002) (same). The court need not address this issue, however, because the court finds that the Program is appropriately characterized as educational. The Program's enabling legislation provides that it "shall commence operations during the 1994–95 *Academic* Year," 2 L.P.R.A. § 801 (emphasis added), and that it is open only to students. *Id.,* § 804. When the original legislation was amended in 2004, the Legislature explained that the Program had given Puerto Rican university students the opportunity to familiarize themselves with the American legislative process and that the amendments were intended to benefit students with diverse academic interests. Laws of Puerto Rico, Act No. 94 of Apr. 23, 2004. Legislative intent clearly shows that the Program is educational in nature, even though, as defendants note, participants work during their internships. I therefore reject defendants' suggestion to analyze plaintiffs' claims under Title I.

The Supreme Court has directed district courts evaluating Title II claims to determine, on a claim-by-claim basis, (1) which aspects of the state's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid. *United States v. Georgia,* 546 U.S. 151, 159, 126 S.Ct. 877, 163 L.Ed.2d 650 (2006). If, at the first step, the state's conduct does not violate Title II, the court does not proceed to the next step in the analysis; the claim ends. *Buchanan v. Maine,* 469 F.3d 158, 172–73 (1st Cir.2006) (citing *Toledo,* 454 F.3d at 31–40).

7. The court disregards plaintiffs' exhibit in support of the claim that Jayrie could get university credit for the Program, as it is not sufficiently referred to in the amended complaint, nor has a certified English translation been submitted. (Docket No. 50–5).

■ To state a claim for a Title II violation, a plaintiff must allege (1) that she is a qualified individual with a disability; (2) that she was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities or was otherwise discriminated against; and (3) that such exclusion, denial of benefits or discrimination was by reason of her disability. *Toledo,* 454 F.3d at 31–32 (citations omitted). Title II imposes an affirmative obligation on public entities to make their programs accessible to qualified individuals with disabilities, except where compliance would result in a fundamental alteration of services or impose an undue burden. *Id.* at 32 (citations omitted).

■ Applying ADA case law, the court held in its previous order that under Law 44, 1 L.P.R.A. §§ 501–511(b), whose elements mirror those required for ADA claims, plaintiffs had sufficiently alleged that Jayrie suffered from a disability. (Docket No. 47, p. 19–27). The amended complaint alleges that the Program is a public entity and that Jayrie, an "outstanding student," applied for, was admitted to, and participated in the Program, but then was expelled, not "for disciplinary problems or conduct, rather for her health condition." [8] (Docket No. 10–3, p. 2, ¶¶ 2, 4, 5, p. 3, ¶¶ 5–7, p. 4, ¶ 11). Plaintiffs further allege that "since she was stabilized, ... Jayrie has been and continues being fully qualified to carry out the basic functions of the Internship Program which she applied for and was admitted to." (*Id.,* p. 5, ¶ 17). Moreover, plaintiffs sufficiently allege that Jayrie was qualified for the Program, given that she had been admitted to it and had already arrived in the Washington area and enrolled in classes before being expelled. The allegations are also sufficient to state that her expulsion constituted exclusion from a public entity's program by reason of her disability. Plaintiffs' amended complaint therefore states a facially plausible Title II claim as to defendants' conduct in expelling her.

■ Certain other aspects of defendants' alleged conduct, however, do not violate Title II. The amended complaint, which is not a model of clarity, apparently attempts to state a claim on a failure-to-accommodate theory. A public entity's failure to provide disabled persons with reasonable modifications constitutes discrimination within the meaning of Title II. *See, e.g., Townsend v. Quasim,* 328 F.3d 511, 517 (9th Cir.2003). Plaintiffs allege that neither Rodríguez or any other Program representative ever offered Jayrie any medical care, counseling, support, or other help after learning of her symptoms, and that after her expulsion and psychiatric treatment, defendants "categorically refused to ... provide ... any reasonable accommodation" for Jayrie to reintegrate into the Program. (Docket No. 10–3, p. 2, ¶ 5, p. 2–3, ¶¶ 4–7, p. 4, ¶¶ 13–14, p. 5, ¶ 15). It is not clear what, exactly, the accommodation in question is; the complaint simply invokes the phrase "reasonable accommodation" without explanation.

■ Even assuming that medical care and counseling would constitute an "accommodation" pre-expulsion, and readmission to the Program would constitute an "accommodation" after the expulsion, plaintiffs have not alleged that Jayrie "ever sufficiently requested the accommodation in question" so as to "adequately put [defendants] on notice of her disability

---

8. This allegation is sufficient to allege intentional discriminatory animus, which is required where, as here, a plaintiff requests non-economic damages under Title II. *Carmona–Rivera v. Puerto Rico,* 464 F.3d 14, 17–18 (1st Cir.2006) (citation omitted).

and need for accommodation." *Reed v. LePage Bakeries, Inc.*, 244 F.3d 254, 259–60 (1st Cir.2001) (applying ADA in employment context). Plaintiffs must have requested an accommodation in order for defendants to be potentially liable for failing to provide it. *See id.* at 261 ("the ADA's reasonable accommodation requirement usually does not apply unless 'triggered by a request'" from the plaintiff). The request must be "'sufficiently direct and specific,' giving notice that [plaintiff] needs a 'special accommodation.'" *Id.* (quoting *Wynne v. Tufts Univ.*, 976 F.2d 791, 795 (1st Cir.1992)) (further citation omitted). There is simply no indication in the amended complaint that Jayrie or her family ever requested any form of accommodation for Jayrie's disability, whether before or after her expulsion. Remarkably, the amended complaint does not even allege that plaintiffs ever *asked* for Jayrie to be reinstated in the Program. (*See* Docket No. 10–3, ¶¶ 15, 16). Accordingly, neither Rodríguez's alleged failure to proactively offer help upon learning of Jayrie's symptoms nor defendants' failure to readmit her to the Program constitutes a Title II violation.

■ Having established that plaintiffs have stated a Title II claim for disability discrimination arising out of Jayrie's expulsion from the Program, the court turns to the next step of the *Georgia* test and evaluates to what extent defendants' conduct also violated the Fourteenth Amendment. *Georgia*, 546 U.S. 151 at 159, 126 S.Ct. 877. Title II validly abrogates sovereign immunity as to state conduct that actually violates the Fourteenth Amendment. *Georgia*, 546 U.S. at 159, 126 S.Ct. 877; *Toledo*, 454 F.3d at 31. "There are two potential sources of constitutional rights in the context of discrimination or a failure to accommodate a disability in public education: the Due Process and the Equal Protection Clauses of the Fourteenth Amendment." *Toledo*, 454 F.3d at 32. "The Due Process Clause guarantees some notice and an opportunity to be heard before a student can be suspended or expelled from school.... These rights are implicated when a student's future attendance at a public institution of higher education is in jeopardy." *Id.* at 32–33 (citing *Goss v. Lopez*, 419 U.S. 565, 574, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975); *Gorman v. Univ. of R.I.*, 837 F.2d 7 (1st Cir.1988)). The First Circuit found the Due Process Clause inapplicable in *Toledo* because the student in that case had voluntarily left the program in which he had been enrolled at UPR. In the case at bar, however, Jayrie was unwillingly expelled from the Program. The court therefore considers whether the expulsion, as alleged, violated the Due Process Clause.

■ Defendants claim that the Program is not a public education program because the Program is not restricted to students from public universities, but merely requires that the student's institution be "located in Puerto Rico." 2 L.P.R.A. § 804. Defendants also note that Jayrie was enrolled at a private university as part of the Program. (Docket No. 51, p. 12, n. 11). Defendants' argument ignores the fact that the Program is a creature of the Puerto Rican government, funded from the general budget, that places participants in public-sector internships. 2 L.P.R.A. §§ 801, 803. Furthermore, defendants' point that the Program is open to students from all Puerto Rican universities merely underscores the Program's general availability. Nor does Jayrie's enrollment in classes at a private university undercut the Program's public nature, any more than opportunities for study at private universities would make a public university's study abroad or other

student exchange program no longer "public."

While the Program falls under the banner of "public education," Jayrie's expulsion therefrom does not rise to the level of a procedural due process violation. Plaintiffs allege that Jayrie was expelled without any notice, procedure, or even explanation. (Docket No. 10–3, ¶¶ 8, 11, 15). In *Goss*, the Supreme Court explained that property interests protected by the Fourteenth Amendment normally are not created by the Constitution, but by "an independent source such as state statutes or rules entitling the citizen to certain benefits." 419 U.S. at 572–73, 95 S.Ct. 729 (citing *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)). The Court accordingly held that where state statutes established a free public school system and made attendance mandatory, public school students had a protected property interest in public education that could not be taken away without adherence to due process requirements. *Id.* at 573–74, 92 S.Ct. 2701. *See also Bogle–Assegai v. Bloomfield Bd. of Educ.*, 467 F.Supp.2d 236 (D.Conn.2006) (state constitutional provision establishing free public elementary and secondary schools in the state creates protected property interest in right to education).

In the case at bar, the state statute that created the Program does not make participation mandatory, as in *Goss*, nor does it create an entitlement to Program internships. *See Roth*, 408 U.S. at 577, 92 S.Ct. 2701 ("To have a property interest in a benefit, a person clearly must … have a legitimate claim of entitlement to it."). The statute gives each member of the Joint Committee for the Program the right to nominate two candidates per year and directs the Joint Committee to establish regulations setting out the method and criteria for selecting candidates. 2

L.P.R.A. § 803. A student's voluntary participation in the Program is subject to this selective and discretionary process. "[T]he protected property interest in public education does not create a similar property interest in non-mandatory activities associated with public education." *Mercado v. Kingsley Area Schs./Traverse City Pub. Schs. Adult Educ. Consortium*, 727 F.Supp. 335, 343 (W.D.Mich.1989), *aff'd*, 956 F.2d 269 (6th Cir.1992) (unpublished) (where state school districts were not required to provide adult education programs, plaintiff had no property right in adult education that was protected by due process) (citing *Berschback v. Grosse Pointe Pub. Sch. Dist.*, 154 Mich.App. 102, 397 N.W.2d 234 (1986)).

■ Since the Due Process Clause is unavailing as a source of a Fourteenth Amendment violation, the court considers whether Jayrie's expulsion violated the Equal Protection Clause. As in *Toledo*, plaintiffs fail to state a claim for discrimination that violates equal protection. Plaintiffs must allege that Jayrie "was intentionally treated differently from others similarly situated and there was no rational basis for the difference in treatment." *Toledo*, 454 F.3d at 34 (citation omitted). The amended complaint is devoid of any such allegations; there is no allegation comparing Jayrie's treatment to the treatment of other Program interns, and plaintiffs' allegation that defendants' actions constitute "discrimination for reason of disability" are insufficient for notice pleading purposes. *Id.* Accordingly, plaintiffs have not alleged state conduct that independently states a claim for a violation of the Equal Protection Clause.

■ Defendants' conduct, as alleged, does not actually violate the Fourteenth Amendment, so the court must proceed to the third and last step of the *Georgia* analysis. At this step, the court analyzes

whether Congress's abrogation of sovereign immunity as to defendants' class of conduct is valid as a prophylactic measure within Congress's power under section 5 of the Fourteenth Amendment. *Georgia,* 546 U.S. at 159, 126 S.Ct. 877. The analysis requires the court to consider (1) the constitutional right or rights that Congress sought to protect when it enacted the statute; (2) whether there was a history of constitutional violations to support Congress's determination that prophylactic legislation was necessary; and (3) whether the statute is a congruent and proportional response to the history and pattern of constitutional violations. *See Lane,* 541 U.S. at 522–31, 124 S.Ct. 1978 (describing the elements of the test set out in *City of Boerne v. P.F. Flores,* 521 U.S. 507, 529–36, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997)). The First Circuit in *Toledo,* guided by Lane, chose to apply its *City of Boerne* analysis to public education generally. 454 F.3d at 36. The court concluded that "Title II, as it applies to the class of cases implicating the right of access to public education, constitutes a valid exercise" of Congress's section 5 authority. *Id.* at 40. Accordingly, the court found that state sovereign immunity is not a defense to Title II discrimination claims in such cases. *Id.*

■■■ Plaintiffs claim that this case fits squarely under *Toledo* because it falls within the same class of cases. The court agrees. Defendants attempt to distinguish *Toledo* from the instant case by averring that the Program is not a public education program because participating students may come from, and take classes at, private universities. (Docket No. 51, p. 12, n. 11, p. 15–16). The court has rejected this argument. Defendants also argue (Docket No. 51, p. 12, n. 11, p. 18–20) that the Program's primary focus is on employment, so the court should decide the in-

stant case in line with the Supreme Court's holding that Congress, in enacting Title I of the ADA, did not meet the second prong of the *City of Boerne* test and that Title I thus did not validly abrogate state sovereign immunity. *See Bd. of Trs. of the Univ. of Ala. v. Garrett,* 531 U.S. 356, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001). This argument is also unconvincing, since the legislative intent behind the program emphasizes that it is an *educational* opportunity. Indeed, the Program is a particularly appropriate example of a case "implicating the right of access to public education" given that "[t]he Supreme Court has recognized the vital importance of all levels of public education in preparing students for work and citizenship as well as the unique harm that occurs when some students are denied that opportunity." *Toledo,* 454 F.3d at 36 (citations omitted). The Program, which places students in government internships in our nation's capital, is precisely a public education program meant to prepare students for work and citizenship. Jayrie's expulsion from the Program is not permissible under Title II simply because she was expected to work, not just to take classes.

In light of the foregoing, the court holds that pursuant to *Toledo,* the Commonwealth defendants are not entitled to Eleventh Amendment immunity from plaintiffs' Title II claim. The court therefore **DENIES** defendants' motion to dismiss the Title II claim against the Commonwealth defendants. Since sovereign immunity does not shield the Commonwealth, it also does not shield the individual defendants in their official capacities. *See Goonewardena v. New York,* 475 F.Supp.2d 310, 326 (S.D.N.Y.2007) (citations omitted). However, the court finds it appropriate to consider briefly Aponte's and McClintock's personal-capacity liability, although the court did not request that the parties brief

the issue and, as noted, plaintiffs appear to sue them in their official capacities only. While the First Circuit has not yet addressed whether personal liability can attach under the ADA, this court has followed the majority of circuits to have done so and answered in the negative. *See, e.g., Reyes–Ortiz v. McConnell Valdes,* 714 F.Supp.2d 234, 237–39 (D.P.R.2010) (citing, *inter alia,* Velez *Nieves v. Microsoft Caribbean, Inc.,* 2006 WL 1805689, at \*5 (D.P.R. Mar. 15, 2006); *Segarra Santiago v. Hernandez,* 2006 WL 572338, at \*4 (D.P.R. Mar. 7, 2006); *Vicenty–Martell v. Estado Libre Asociado de P.R.,* 48 F.Supp.2d 81, 88 (D.P.R.1999)). Accordingly, the court **DISMISSES WITH PREJUDICE** plaintiffs' Title II claims against individual defendants McClintock and Aponte in their personal capacities.

## B. Rehabilitation Act

█ Section 504 of the Rehabilitation Act prohibits discrimination against disabled individuals in any program or activity that receives federal funding. 29 U.S.C. § 794(a). Despite the court's order that the parties discuss sovereign immunity with regard to both the ADA and Rehabilitation Act claims (Docket No. 47, p. 29), defendants' brief does not address the latter separately. (Docket No. 51). Plaintiffs, on the other hand, point out (Docket No. 50, p. 10–11) that in response to the Supreme Court's decision in *Scanlon,* Congress amended the Rehabilitation Act to abrogate state sovereign immunity in actions for violations of section 504 of the statute. 42 U.S.C. § 2000d–7; *Nieves–Márquez v. Puerto Rico,* 353 F.3d 108, 129 (1st Cir.2003) (citing *Lane v. Pena,* 518 U.S. 187, 116 S.Ct. 2092, 135 L.Ed.2d 486 (1996)). Consequently, those government defendants to have accepted federal funds have waived Eleventh Amendment immunity under section 504. *Nieves–Márquez,* 353 F.3d at 127–29.

Plaintiffs note that it is a matter of public record that the Puerto Rico government receives substantial federal funds in a number of areas. (Docket No. 50, p. 11). The First Circuit has held on multiple occasions that the Commonwealth has waived Eleventh Amendment immunity against Rehabilitation Act claims by accepting federal funds. *Díaz–Fonseca v. Puerto Rico,* 451 F.3d 13, 33 (1st Cir.2006) (state defendants included Commonwealth and Department of Education); *Nieves–Márquez,* 353 F.3d at 129 & n. 25 (same state defendants). Thus, it is clear that the Commonwealth, the two houses of the Legislative Assembly, and the two heads of those houses (in their official capacities) have no sovereign immunity from plaintiffs' section 504 claim.

As for the defendant Program, the court finds that plaintiffs have sufficiently alleged that the Program receives federal funds and as such has also waived sovereign immunity. In the Rule 12(b)(6) context, the court takes the allegations of the complaint as true and draws all reasonable inferences therefrom in the plaintiff's favor. *Boston Scientific,* 523 F.3d at 85. Once a complaint has adequately stated a facially plausible claim to relief, the claim may be supported "by showing any set of facts consistent with the allegations in the complaint." *Twombly,* 550 U.S. at 563, 570, 127 S.Ct. 1955. Plaintiffs' amended complaint alleges on information and belief that the Program does receive federal funds [9] (Docket No. 10–3, ¶ 5), though de-

---

**9.** While plaintiffs allege that extrinsic evidence exists of the Program's federal funding (Docket No. 50, p. 10), the evidence submitted is in Spanish (Docket No. 50–4) and plaintiffs have not submitted a certified English translation. The court disregards this evidence because it does not comply with Local Rule 5(g). Moreover, the evidence is not central to the

fendants' answers to the amended complaint deny the allegation. (Docket Nos. 57, ¶ 5; 61, ¶ 5). As plaintiffs point out, the Program's organic statute provides that it will be funded from the Commonwealth government's general expense budget. 2 L.P.R.A. § 801. The court thus can reasonably infer in plaintiffs' favor, until presented with competent evidence to the contrary, that federal monies have found their way through the general budget into the Program's coffers.

■ While I am unpersuaded by defendants' sovereign immunity defense, in order to survive defendants' motion to dismiss, plaintiffs must still plead facts sufficient to make out a facially plausible Rehabilitation Act claim.[10] Section 504 of the Act prohibits federally-funded entities from discriminating against individuals, including students, with disabilities. *J.D. ex rel. J.D. v. Pawlet Sch. Dist.*, 224 F.3d 60, 70 (2d Cir.2000).[11] A federally-funded organization violates section 504 if it denies

a qualified individual with a disability a reasonable accommodation that the individual needs in order to enjoy meaningful access to the benefits of public services. *See Alexander v. Choate*, 469 U.S. 287, 301–02 & n. 21, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985). Plaintiffs' amended complaint attempts to encompass both a disability discrimination theory and a failure-to-accommodate theory. *See McWright v. Alexander*, 982 F.2d 222, 225–26 (7th Cir. 1992) (assuming, without analysis, that reasonable accommodation claim can be brought separately from section 504 handicap discrimination claim).

■ To state a claim for discrimination, a plaintiff must allege that (1) she is disabled, (2) she sought to participate in a federally-funded program or activity, (3) she was "otherwise qualified" to participate, and (4) she was denied participation "solely by reason of her . . . disability." *Lesley v. Hee Man Chie*, 250 F.3d 47, 52–53 (1st Cir.2001) (citing 29 U.S.C.

Rehabilitation Act claim nor invoked in the amended complaint, and the court will not convert defendants' motion to dismiss to one for summary judgment by taking the exhibit into consideration. *See* Fed.R.Civ.P. 12(d).

**10.** In their brief, defendants request that the court reconsider its refusal (Docket No. 47, p. 9, n. 7) to dismiss plaintiffs' Rehabilitation Act claim because the amended complaint does not specifically invoke the statute or even mention the word "rehabilitation." (Docket No. 51, p. 9, n. 8; *see also* Docket No. 34, p. 3–4). Plaintiffs mention the Rehabilitation Act for the first time in their opposition to defendants' motion to dismiss. (Docket No. 13, p. 3). As the court has previously noted, the same standards apply to section 504 and Title II claims. In addition to the allegations relevant to the ADA claim, the amended complaint alleges that the Program "receives state *and federal* funds" and that plaintiffs are bringing claims under, "but no[t] limited to," the ADA and Law 44, among others named therein. (Docket No. 10–3, ¶¶ 5, 18) (emphasis added). The court finds

the amended complaint's allegations sufficient to put defendants on notice that plaintiffs were asserting a Rehabilitation Act claim in addition to the Title II claim. *See Spencer v. Earley*, 278 Fed.Appx. 254, 261 (4th Cir. 2008) (unpublished) (citing 29 U.S.C. § 794(a); further citations omitted). Therefore, the court **DENIES** defendants' request for reconsideration.

**11.** Defendants argue that the Program is properly analyzed as an employment program, not as a public education program. (Docket No. 51, p. 10, n. 10; p. 12, n. 11). The court has rejected this characterization, *supra*, and given the broad definition of "program or activity" under Section 504, the characterization of the Program as employment-related does not alter the court's analysis. 29 U.S.C. § 794(b) (defining "program or activity"); *see Currie*, 290 F.3d at 7 n. 4 (under the Rehabilitation Act, "the phrase 'program or activity' has been held to cover employment practices") (citing *Consol. Rail Corp. v. Darrone*, 465 U.S. 624, 632–34, 104 S.Ct. 1248, 79 L.Ed.2d 568 (1984)).

§ 794(a)). To assert a failure-to-accommodate claim, a plaintiff must establish that (1) she suffers from a "disability" within the meaning of the statute, (2) she is a qualified individual inasmuch as she is able to perform the essential functions of the position in question, with or without reasonable accommodation, and that (3) despite its knowledge of her disability, the defendant did not offer a reasonable accommodation. *Enica v. Principi,* 544 F.3d 328, 338 (1st Cir.2008).

■ Plaintiffs' claim of discrimination is analyzed under the same standards as those used to determine whether Title II has been violated, though plaintiffs need not plead that the Program is a public entity but must additionally plead that the Program received federal funding, which they have indeed done. *See Tardie v. Rehabilitation Hosp. of R.I.,* 168 F.3d 538, 542 (1st Cir.1999). For the reasons stated above in the court's Title II analysis, plaintiffs have adequately pled that Jayrie is a qualified individual with a disability [12] who was denied participation in the Program. Plaintiffs allege that defendants told Jayrie's parents "that Jayrie had not been expelled for disciplinary problems or conduct, rather for her health condition." (Docket No. 10-3, p. 4, ¶ 11). The court considers this a sufficient allegation that Jayrie's disability was the sole basis for the alleged discrimination. Plaintiffs therefore state a facially plausible Rehabilitation Act claim for intentional discrimination.

However, as with the Title II claim, the amended complaint does not sufficiently allege a Rehabilitation Act violation under a failure-to-accommodate theory. The court's prior finding that plaintiffs have sufficiently pled defendants' knowledge of Jayrie's disability (Docket No. 47, p. 19–22) establishes that plaintiffs have sufficiently alleged the knowledge element of a failure-to-accommodate claim. But, for the reasons stated above, mere knowledge is not enough; plaintiffs must have requested an accommodation, and the amended complaint fails on that account. *Reed,* 244 F.3d at 259–60. In short, while plaintiffs' claim for disability discrimination survives the motion to dismiss, plaintiffs may not proceed under a failure-to-accommodate theory.

Accordingly, the court **DENIES** defendants' motion to dismiss plaintiffs' Rehabilitation Act claims against the Commonwealth defendants. Defendants remain free to re-argue the Program's sovereign immunity once evidence regarding the sources of the Program's funding has been developed further.[13] However, this court has previously joined other courts in holding that the Rehabilitation Act, like the ADA, does not permit individuals to be held personally liable. *Sifre v. Dep't of Health,* 38 F.Supp.2d 91, 106 (D.P.R.1999) (citing cases). Accordingly, the court **DIS-**

---

12. The court's previous holding that Jayrie suffered from a disability within the meaning of the ADA (Docket No. 47, p. 22–27) is likewise applicable under section 504, since the ADA's definition of disability is modeled "almost verbatim" on the analogous term in the Rehabilitation Act. *Bragdon v. Abbott,* 524 U.S. 624, 631, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998); *see also Bercovitch v. Baldwin School, Inc.,* 133 F.3d 141, 152 n. 13 (1st Cir.1998) ("we treat the ADA and the Rehabilitation Act as imposing parallel requirements").

13. "Although the plaintiff bears the burden of proving the court's jurisdiction, the plaintiff should be given the opportunity to discover facts that would support his allegations of jurisdiction." *Majd–Pour v. Georgiana Cmty. Hosp. Inc.,* 724 F.2d 901, 903 (11th Cir.1984), *cited in Mills v. State of Me.,* 118 F.3d 37, 50 (1st Cir.1997) (upholding district court's rejection of plaintiffs' attempted fishing expedition for discovery to identify any or all federal programs in which state participated).

**MISSES WITH PREJUDICE** plaintiffs' Rehabilitation Act claims against individual defendants Aponte and McClintock in their personal capacities.

## CONCLUSION

The court **DISMISSES WITH PREJUDICE** plaintiffs' Article 1802 and 1803 claims against the Program, the Senate, the House, and McClintock and Aponte in their official capacities, **DISMISSES** any Article 1802 and 1803 claims against Aponte and McClintock in their personal capacities, **DENIES** defendants' motion to dismiss plaintiffs' Title II and Rehabilitation Act claims against the Commonwealth defendants, and **DISMISSES WITH PREJUDICE** any Title II and Rehabilitation Act claims against Aponte and McClintock in their personal capacities. Defendant Rodríguez remains in default.

**IT IS SO ORDERED.**